I'm splitting my time with co-counsel, Your Honor. I had proposed to take 13 minutes for opening up a 12-minute speech. Is that sufficient? 12 minutes, okay. Thank you. I'd like to reserve two minutes for rebuttal, Your Honor. Thank you. May it please the Court, Timothy McCrum for the National Mining Association, which is challenging the Interior Secretary's withdrawal and closure of over 1 million acres of multiple-use lands in northern Arizona. The intent of Congress in passing the Federal Land Policy and Management Act of 1976 was unquestionably to restrict the executive's authority to withdraw federal lands from operation of the mining fund. We know that this was the intent of Congress because of the extraordinary action taken by Congress in the plain text of the statute, in particular in Section 704, which expressly revoked the implied authority of the executive to carry out federal land withdrawals, which had been recognized by the 1915 decision of the U.S. Supreme Court in United States v. Midwest Oil. That decision had recognized an implied authority to the executive from the various public land statutes passed by Congress, and that authority allowed the executive to carry out vast and unrestricted withdrawals of federal lands. The Court's decision in Midwest Oil found no inherent power of the executive to make land withdrawals, and that is not surprising because the property clause itself places the authority to make rules respecting the public lands with the Congress, not the executive. Yet despite the Congress's express rescission and revocation of the Secretary's implied withdrawal authority in the FLTMA statute of 1976, the Secretary's brief before this Court makes the odd assertion twice that Congress in FLTMA recognized the Secretary's large-tract withdrawal authority. I submit that in 1976, Congress did not recognize the Secretary's land withdrawal authority. The Congress rescinded it and revoked it. And then in Section 204 of the statute, the Congress delegated new, limited, and constrained land withdrawal authority to the Secretary. My apologies. Let me ask you what I think is an overarching question. You have a severability clause in here. There's no question about it. Yes, Your Honor. I've searched and I haven't found any case which found that notwithstanding the existence of a severability clause, that nonetheless, you know, the statute, you know, would there be no severability? I'm just wondering in case there was. Yes, Your Honor. The severability clause makes it clear that a constitutional defect in a provision would not affect the remainder of the statute. But what cases are you having in the face of a severability clause that since notwithstanding the existence of a severability clause, we don't have a case in which severability is implied? Well, one case that's particularly instructive is the decision from this court in Western States Medical Center from 2001, which involved a statute that had a severability clause. Nonetheless, this court found that where the statute in question was striking a balance between competing interests. Doesn't every statute strike a balance between competing interests? Yes, it does to some extent, Your Honor. But particularly in that case, the Western States Medical Center case, you had an authorization for drug compounding activity to not be subject to full FDA review. And it was coupled with a restriction on advertising, which this court found. In that case, the decision of the court was that there's no severability? In that case, Your Honor, the court found that a particular provision of the statute in question that restricted advertising of these particular drugs coupled with an authorization for those drugs to not comply with normal FDA review, that those provisions were linked together. And they could not be, they had to be found void where the authorization from the Congress was linked together with the unconstitutional provision in that case, a restriction on advertising. With regard to this issue in particular, which arises with some frequency, because there was a period in which Congress seemed to be doing these legislative vetoes, well, CHATA in particular seemed to rely almost exclusively on the fact that there was a severability clause in it. And therefore, it was severable, the legislative veto provision. Your Honor, in the CHATA case, the legislative veto was in a particular subsection, different from the authorization which was in question. Here in this case, we find that the authorizations, the secretary, to carry out the large tract withdrawals is embedded directly in the section 204C1 where the congressional veto power is contained. And in the Alaska Airlines case of the Supreme Court following CHATA, the court specifically noted that if the unconstitutional veto power was linked together, and the court used the word linked, if it was linked together with the, in that case, a creation of an obligation to rehire certain airline employees, if that had been linked together, then that would have resulted in a different result in that case. I believe there was a Alaska Airlines case, Your Honor. I believe there was. But many cases have said the severability clause itself is not typically going to answer this question. We need to look at what the intent of Congress was, which in this case was to restrict and restrain the secretary's unfettered withdrawal authority that existed on an implied basis prior to the statute. If there's a 20-year interruptive hearing talking about this, I guess it was totally unfettered. I would think the case, but there are limitations. Your Honor, you're correct that there's a 20-year limitation, and that's the only substantive limitation imposed. It is significant, but as the government has acknowledged in their brief in this case, that 20 years can be renewed indefinitely. So it is really a, it is an indefinite authority. Do all court requirements have hearing? Are there procedural requirements to have hearings? There is a, there's an obligation to provide Federal Register notice and notice to the Congress. And to have a hearing. There's an obligation to provide a hearing. So a series of. There are a series of limitations introduced as previously. There are a series of procedural restrictions, Your Honor. That's correct. Yes. In the end, the Congress always, when an ordinary bill is approving it, they have to have legislative, they have to either have the President sign it or offer right of veto, but it's not like they're outlaws. The Congress could pass separate legislation signed by the President to restrict the executive action in question. Right. But why aren't these procedural restrictions or oversight sufficient in your view? The Congress created these procedures not thinking they were important, but they made a clear distinction for withdrawals under 5,000 acres and withdrawals above 5,000 acres. And for withdrawals above 5,000 acres, Congress embedded this authority to review and veto those large withdrawals as an express condition of the delegation. I don't think you're answering my question. Why aren't these procedural oversight mechanisms sufficient to address the concern? Well, Your Honor, that would be an interesting policy question that Congress might have considered. But when we look at the statute in this case, Congress made the determination that those procedures were not sufficient because it expressly placed the congressional veto power directly in the delegation of a large-scale withdrawal authority. So Congress made the determination that those procedures were not sufficient. And I'm here standing for the National Mining Association, but I would refer the Court to the academic law professors who have looked at this issue for decades, which we cite Professors Glixman and Professor Coggins. And they have addressed this issue for decades, back to 1984. I didn't look at the academic literature, but I am almost morally certain that I can find some people who said, yeah, there's no academic literature. One might think so, Your Honor, but it's notable that the government cites not a single. Because maybe they think we don't really care too much about what they do. Perhaps. Perhaps they could be. But I find it striking that the government provides no academic articles or views on this question. And we have Professor Coggins and Glixman who have addressed this in a lengthy article in the Hastings Law Journal and in their multi-volume treatise. It seems to me that this kind of provision is particularly unlikely to not be severable because of the fact that it is, you know, simply a way in which Congress can disapprove it. But it still has a way in which it can disapprove it. The congressional veto was a way that the Congress could disapprove the action without presentment to the executive. Because, after all, it's the executive that's carrying out the action in question. And that's why the Congress viewed the provision as important. And it expressly placed it as a limitation in this delegation of authority. But, for example, there are changes in administration. Try again. I mean, it doesn't – I mean, it's an exception to the way that the Congress usually operates in the sense that when the Constitution delegates things to Congress, in general, it is delegating a check by Congress, which means presenting to the president and having the president sign it, right? In other words, you rely to some degree on the fact that the Constitution delegates public lands issues to Congress. But that doesn't mean Congress goes by itself. That's really what Chadha ultimately decided. Yes, that's right. And this statute was passed in 1976, seven years before Chadha, when his congressional veto power was presumed to be constitutional, precisely because it had been in many statutes over the years. And Congress thought this was a meaningful limitation that it was placing on the delegation of the authority. And that's why we rely, first and foremost, on the express language of the delegation in Section 404A and C, where you find that the only authorization for the large-scale withdrawal is subject to this limitation. What has Congress done subsequent to the withdrawal? If anything, have they taken the side of advisory again? Has there been any proposed legislation in the side of that? In the case of this particular withdrawal, the House Natural Resources Committee issued a strong statement opposing the withdrawal. But this particular, the congressional veto has been recognized as null and void since the Chadha decision. So the Congress has not passed a, they've not attempted to carry out the congressional veto. Could have acted here, but there's been no action by Congress as to whether deleting it through lawyers to fix the issue tonight. The Congress has not enacted the law to override the withdrawal in question, which would require a presentment to the Executive, Your Honor. There was a healthy debate in Congress also about the pros and the cons of all of this, correct? Yes, there was. And the outcome was the delegation of the small tract withdrawal up to 5,000 acres. But, you know, you have to overcome the presumption of severability. You haven't given me any case that I am satisfied with that gives us an example where that has happened by some decision or law. What you refer to I don't think is, you know, relevant here, but we'll look at that again. But where is the strong evidence that's necessary to overcome the presumption of severability just because you sort of made for the congressional record that this is what Congress intended? No, Your Honor. We don't rely primarily on the congressional record as members of Congress. We rely on the plain language of the statute itself, on the express, first the revocation of the authority of the Executive to make large unrestrained withdrawals, and then in the way the structure of Section 204 has been set up so that the only way the large-scale withdrawal authority was delegated was expressly with the congressional veto as a condition. And 204A states that all limitations apply. Your Honor, I have time, but I have one last question. Is there a case, and this is essentially what Judge Block has been asking, with regard to the severability of the legislative veto in particular, because there have been a number of such cases, where there was a severability clause and where it was held not severable? The Western States Medical Center is the best case. It was not about congressional veto. That's correct. When I asked you, is there a case about legislative veto, where there was a severability clause and where it was held not severable? I'm not certain, Your Honor, if there is. Okay. Thank you very much. Thank you. We're way over your time, sir. Good afternoon. May it please the Court. My name is Jeffrey McCoy. I represent American Exploration and Mining Association. American Exploration and Mining Association joins with National Mining Association in the severability clause argument. You're basically just a parallel association to them. No, Your Honor. American Exploration and Mining Association is the focus a lot more, as their name indicates, on exploration. There is another organization of mining people. Yes. And American Exploration and Mining Association has members at all stages, including geologists, from location. Do you have something else you're going to argue about? Yes, Your Honor. Your Honor, in the alternative, this Court should set aside the million-acre withdrawal because the record does not support the justifications either in the application for the withdrawal or the Secretary's application. At a minimum, this Court should set aside the 355,000 acres of Forest Service land that was withdrawn because the Forest Service's consent to the withdrawal was inconsistent with the Governing Forest Plan. Is this the north parcel? It is. It is the south parcel. What's the south parcel? There are portions of the east as well, but mostly it's primarily the south parcel. To that point, for the 355,000 acres, the Governing Forest Plan, in effect at the time most recently amended in 2008 at that time, contemplated minerals management and specifically stated certain discrete areas that were appropriate for withdrawal. There was four distinct areas. They are from, in AMEA's executive record, from 410 to 420 is where they state for specific recreation and vegetation areas. The EIS for the Forest Plan indicates that the Forest Service believed that these were necessary for withdrawal. As a result, the Forest Service made decisions based on minerals management and on withdrawal decisions, but the Forest Service's consent to the withdrawal was inconsistent with the Governing Forest Plan as it consented to withdraw 300 acres. I understand that the main defense to all this is that it is the business of the Forest Service. Well, Your Honor, that is inconsistent with the way that the Forest Service has set up their Forest Plan. I mean, the purpose and needs section of the Forest Plan says... Excuse me. The legal argument, and I thought the conclusion of the district court, is that the Forest Service, this is a BLM decision, it's not a Forest Service decision. Flipmutt expressly states that lands from other departments outside the Department of Interior cannot be withdrawn without the consent of the department. In this case, the lands could not have been withdrawn without the consent of the Forest Service. That is in 43 U.S.C. 1714, subsection I. Ultimately, the Secretary of the Interior decides. No, Your Honor, because if the Forest Service had not consented to the withdrawal, the Forest Service lands would not have been withdrawn. So it is ultimately the decision of the Forest Service. Wait, aren't the ones that make that decision to withdraw? It is a combined decision. The Secretary signed the record of decision, but in the record of decision, noted that it received the consent of the Forest Service. And as 43 U.S.C. section 1714 I expressly provides, the Secretary cannot withdraw Forest Service lands without the Forest Service consent. So the consent acted as a legal obligation, because without the consent there would have been no withdrawal of the Forest Service lands. What did the district court rule about this? Your Honor, this was argued below. I know it was argued. What was the decision? If you just listen to the question, it would really help. Okay. What did they decide? The district court ultimately decided that the minerals management was outside the scope of Forest Planning process. And so that the decision to consent... So that's what you're contesting, you're saying is not true? Yes. Because both the Forest Service regulations governed minerals management and the... I thought the Forest Service regulations governed was essentially the plan of operation, but not the question of whether there's going to be a mine there. While the BLM ultimately makes the underlying determination of the minerals management, the regulations and plain plan of operations are governed by... But the plan of operation was from 1986. What was the Forest Service going to consent to? But they presumably consented to it in 1986. Well, the question of what their consent was was whether they were going to consent to the withdrawal. I understand that. And where does it get the authority to consent to the withdrawal? If they're not dealing with the question of whether there's going to be mining or not going to be mining, that's not their problem. 43 U.S.C. 1714 subsection I in Flipa is where the authority, where the consent to the withdrawal comes from. And ultimately, the withdrawal question, the question of whether they consent to the withdrawal, draws into how it affects the use of the Forest Service. Because if they consent to a withdrawal, then citizens are no longer allowed to go out and explore and locate. That relates back to the use of the Forest Service. I'm sorry. What are you challenging here? I'm trying to understand because you're saying that the District Court found that the Forest Service consented to the withdrawal, and that decision that it based its consent on was not arbitrary and capricious. You're challenging that? No, the District Court determined that the Forest Service's consent to the withdrawal did not need to be consistent with the governing Forest Plan. But ultimately, it had to determine whether it was arbitrary and capricious, no? Well, I would say that it's the abuse of discretion or otherwise not in accordance with law. Okay. The National Forest. Okay. And so we are saying that it was not in accordance with law, but you're challenging that determination. I just want to understand your answer. Yes. Why? The National Forest Management Act provides that instruments that affect the use and occupancy of Forest Service land must be consistent with the governing Forest Plan. And as this Court said in Friends of Southeast Future v. Morrison, a decision that affects the use and occupancy of Forest Service land has to be consistent with the governing Forest Plan and affect it at the time. I'm confused. You're saying that the Forest Service did or did not give its consent and approval. Well, it sent a letter to the Chief of the Forest Service. We said it was an unlawful consent. They did send a letter. They purported it was unlawful because it did not comply with what you claim was required under these various regulations and laws, right? Correct. So is not our review process as a circuit court to determine whether that was an arbitrary or capricious decision? Is that what we're talking about? Well, Your Honor, I do think that the whole of the section under the APA is informative. It's arbitrary and capricious or otherwise not in accordance with law. And I think that this is a purely legal question of whether, and this is how the district court treated it as a legal question, whether. Let me ask you this. Does the district court say the suggestion and regulations make clear that the Secretary of Agriculture and the Forest Plans created within his agency do not have the authority to open or close lands to mining? Is that true or false? To open, the Secretary makes the ultimate decision, but the Forest Service is a necessary component of whether or not. In other words, if the Forest Service has the authority to not consent, then there's no withdrawal. Correct. But that is not what the statute says, is it? Again, 43 U.S.C. Section 17 of 14i says, quote, in the case of lands under the administration of any department or agency other than the Department of the Interior, the Secretary shall make, modify, and revoke withdrawals only with the consent of the head of the department or agency considered. But you say only consent, but you're challenging whether that was a valid consent. Yes, whether it was a lawful consent. Because that consent acted changed the rights and obligations of the citizens' use of the Forest Service land, and because that decision affected the use and occupancy of Forest Service lands, the National Forest Management Act requires that that decision be consistent with the governing Forest Plan. But I guess the concern for multiple use, which I think is what you're talking about, does not preclude consent to mining withdrawal for essentially the same reasons, it seems, that multiple use considerations by the Secretary Interior do not preclude exercise withdrawal authority. I'm trying to figure out your argument here. Because it seems like also the NFMA promulgated land management plans don't recognize or affect mining exploration rights. Only the Secretary of the Interior can cause lands to be open or closed for mining exploration. So I don't see how the withdrawal could be inconsistent with the requirements of the land management plans, which I think is what you're arguing. The argument that minerals management is outside the scope of the forest planning process was rejected by the District Court of Idaho and Pacific Rivers Council v. Thomas, which cited in our brief was 873 Federal Supplement 365. And there the court looked to the Forest Service's regulations, the governing Forest Plan, and noted that the Forest Service itself believed that it had the authority over minerals management. The same is here. The governing Forest Plan considered minerals management, including withdrawal decisions, and therefore their decisions have to be consistent with that. I see I'm out of time. Thank you. May it please the Court. Are you deciding to? Yes. I had planned to take 20 minutes myself. I only have 10 minutes for Mr. Zekowski. At the 10 o'clock, please. May it please the Court. Brian Toth from the Department of Justice, representing the Federal Defendant's Appellees. I want to start with the severability question of the legislative veto mechanism. I think the District Court took the proper approach here in looking at congressional intent. And it certainly helps by the presence of the severability clause, but the bottom line is that under basic principles, incorporating a presumption of severability, the text structure and the history of the congressional treatment of executive branch withdrawal authority in FLTMA all demonstrate that Congress would not have intended to reserve exclusively to itself the authority to withdraw large tracts of the public lands. And so the question is not, as my friend framed it, whether Congress intended to restrict the executive branch's authority to withdraw lands, but whether Congress would have intended that there be no authority delegated to the President in that regard at all. Well, do you think would Congress have passed FLTMA if Congress had known a legislative veto was unconstitutional? That's an exercise in speculation that's fraught with peril. But I can try and guide the Court to get to the best answer, which I think the intent here with respect to withdrawals is embodied in 1701A4. It's that Congress do two things. First, that it exercise its constitutional authority to reserve unto itself authority to withdraw lands for a specific purpose. Those are typically, and you see that in 204J. Congress has reserved to itself exclusive authority to modify withdrawals that were made by acts of Congress that can only be made by acts of Congress for withdrawals that create Fish and Wildlife Service refuges and other matters such as wilderness areas, national parks, and the like. The second purpose in 1701A4 is that Congress delineate the authority that it is recognizing or delegating, however you want to frame it, in the executive branch for making withdrawals. Now, it does that through the various limitations in the other sections of Section 204. With respect to large-tract withdrawal authority, even after severing the veto mechanism, you still have important limitations on executive branch authority. You have, especially the 20-year term. I'd point to the 20-year term and the non-delegability in 204A as probably two of the most important limitations. But that can be renewed, I guess, over and over again, right? It can, but the renewal provision says only if the Secretary determines that the purpose of the original withdrawal requires renewal. So it is limited in that substantive sense. Does the 5,000-acre classification also have a limitation time period? It depends on what the justification is for it. It said that this is the small tract in 204D. It says that it can be reserved indefinitely under D1 for such time as the Secretary deems desirable for resource use. So, for example, to protect water, if this withdrawal were under 5,000 acres, it could be indefinite. Is there a way to draw the line between 5,000, 10,000, 20,000? What does the statute inform us about that? So it says nothing. Above 5,000, there's no acreage limitation. I mean, that's a hard question, which may be governed by the strong statutory presumption in favor of severability. Not really whether the Congress would have provided for some large withdrawal, but would it have been the same amount? Would it have had other conditions? In other words, would the statute have been different in some fashion? So we just don't know. I mean, the precise contours of what the legislative bargain Congress might have struck, had it known that the veto mechanism were unconstitutional. Therefore, we apply as we look for strong evidence for the contrary, and we don't have it. That's exactly right. The presumption, especially with the severability clause, but even just under basic principles that the Supreme Court has announced, is that a statute, a court endeavors to save as much of it as possible. Why is there no strong evidence here? Well, the evidence that we can find is that there was a twofold purpose that it served. I mean, what they're arguing for is that the large tract withdrawal somehow be re-reserved to Congress. And if Congress had wanted to keep that authority to itself, it could have easily done so expressly the way it did for national parks, refuges, and the like, and to a Fort J. Well, but what it did was come to some middle ground, right, where we don't want to be looking at every one of these things, but we'll look at what we reserved to ourselves the right to look at them, essentially what it did. I mean, with some, we're going to look at every one of them. And for this category, we're not going to look at every one of them in advance, but we're going to reserve the possibility of looking at it. Yes, and so a lot of the contours within which Congress looks at it are still, will still survive after severance. And this includes all the reporting requirements, essentially requiring the Secretary to justify and report on the merits of the withdrawal. These are all in 204C2, the 12 or so items that the Secretary is supposed to report on. Another limitation that would still remain as part of this bargain, even absent the legislative veto, is this limited delegability in 204A. And this is important, especially when coupled with the 20-year term. If you go back to the public. What do you mean by that? Okay, so 204A says. What do you mean by that? The only officials that can make a withdrawal decision are the Secretary of the Interior or another political appointee, Senate-confirmed, within the office of the Secretary. And it was important, if you go back and look at Recommendations 8 and 10 of the PLLRC, the Public Lands, Law Lands Review Commission's recommendations, they expressly pointed to that non-delegability or limited delegability as a limitation. And it was because, I mean, one of their concerns was that land management agencies might just get to propose and approve things on their own. This was another set of eyes to look at it that was removed from the BLM and the Forest Service. In addition, when coupled with the 20-year term, the 20-year term was important in the Land Law Review Commission's report because the executive branch had been making withdrawals for indefinite terms or in aid of legislation that ended up never getting introduced. And so you had withdrawals out there, and this is mentioned in the PLLRC report, that the legislation might never have gotten introduced, but the withdrawal had not been revoked. So Congress wanted to put an end to that and put the 20-year term on it. It ensures that a future administration, a different administration, will have to make a decision about whether to renew the withdrawal and that it will be made by a politically accountable official. So those are two important limitations that I want to point out. Basically, the limitations are the 20 years, the notice, the Federal Register, the hearings, and just not accountability. That seems to capture it. I'm sorry? Yes, that's correct. Moving on, there seems to be considerable uncertainty about whether uranium mining has caused uranium contamination in the Grand Canyon watershed. And there's additional uncertainty about whether the North Parcel, in particular, is even within the Grand Canyon watershed. And I just wanted to ask, is that too much uncertainty for the withdrawal of the North Parcel to be lawful? I don't think so. I mean, the withdrawal stands on four different rationales, and so I will address that directly about water resources, but I do want to mention that cultural resources and the importance of cultural resources to the entire area. East Besix federally recognized tribes. It was an additional alternative independent rationale for the North Parcel. But even just focusing on water resources alone, there was a lot of uncertainty about the movement of groundwater in this area. There are lots of different types of unique geological formations under the surface, and the groundwater flow is not as well understood as the surface water flow. And, of course, in this arid to arid region, the groundwater, I mean, the springs that are in the area are an important source of water and water quality to the biological life. Well, the amount of land withdrawn here was vast, and I'm trying to figure out why were the boundaries set so far from the Grand Canyon National Park, and do those boundaries themselves need to be supported by substantial evidence? Well, I mean, I think this definitely survives a substantial evidence challenge on those. The boundaries. The boundaries, yes. Because if you look at the, we cited some maps in our discussion of this, the maps for the flow of groundwater are not, they will illustrate that the flow does not correspond to the same watershed boundaries as surface water flow does. And it's not, and the record mentions, you know, there's a very small chance that the groundwater in the North Parcel area you're talking about will, if contaminated, will result in contamination within the Grand Canyon watershed itself. Well, and one thing that I find difficult about the substantive questions of the kind you're discussing now is that that standard here seems to be incredibly amorphous. Now, I understand you argue in the district court that that meant it wasn't reviewable. You're not arguing that anymore. But what's the bench line that we're looking at? I mean, for example, ultimately what you decided about the water is, as I understand it, we don't know very much about how it's flowing and whether uranium is getting into it or not. But if it were, that would be very bad. So we are going to take, withdraw this land because of, essentially because we don't know, but the risk is high. Now, what do we measure that in many statutory schemes that would fly? You have to have no more. So you have to view their challenge through the lens of the substantive statutes that they make. That's what I'm just saying. And the best. What am I pulling it through here? So the best claim, it's good, that is perhaps a better question for them. But as we best understand it, I mean, the closest they've come to pleading a claim in this regard is their multiple-use challenge. Under FLTMA, they challenge the balancing of uses in the area. Now, I mean, there are lots of different legal reasons why that challenge doesn't work. The uses that this was, the use that they're complaining about being allegedly eliminated, mining, is still going to go forward, as we saw from the preceding case, on National Forest Service lands, as we've seen in the Center for Biological Diversity case on BLM lands. So mining still occurs. Their multiple-use claim fails for that legal reason. You can also view their fact-based challenges as sort of challenging the rationale of the decision. And really, I mean, Judge McGee, you mentioned the substantial evidence standard. That's the standard that the APA incorporates for fact-based challenges to the agency's fact-based conclusions. And it's a very lenient standard. It simply requires that the court find that the agency's fact-based conclusions were supported in such a way that a reasonable fact-finder could have reached the same conclusion. By contrast, what they would have to show is that no reasonable fact-finder could have reached the conclusion. So let me ask the next question, because you seemed to argue earlier that the withdrawal was justified, in part, not just on the water contamination, but on cultural tribal resources being affected. But do the lands withdrawn have to follow the boundaries of those sites and areas as well? And do you think that's what happened here? I don't believe they do for the withdrawal, because there is not a substantive limit to the withdrawal authority. I mean, the most that we have is the definition of withdrawal, which says that it is a land. We're talking about the boundaries here. Yes, and I think this is in reference to the sites. Their argument is that so long as you're protecting the sites or you mitigate around particular cultural sites, that's all you can do. Now, maybe I think this is the difference between what's the legal floor and what's the legal ceiling of a secretary's discretion. You know, if the United States is sued by a tribe to compel this type of withdrawal, that case will fail, because the law may require a minimum of protecting the sites that are culturally important to tribes, but no more. That does not mean, and it shouldn't be confused, however, with the secretary's discretion here under FLTMA to withdraw for protective and precautionary reasons, both for cultural sites and for environmental sites, a larger area. But you said there are specific cultural sites, and there also is at least an expressed interest in the large area by the Indian cultures, not just an individual site. That's absolutely right, and that's supported by lots of literature in the record that they cite regarding cultural landscapes and how many tribes view their existence as tied to the entire landscape. Myron, could you address, or are you planning to address the Forest Service question? Absolutely. So, to try and untangle this, I think it's true that the secretary can only make the withdrawal of the Forest Service lands with the consent of the Forest Service. However, the Forest Service's consent has to be based on its operative statutes, and those statutes do not enable the Forest Service to regulate mining or mineral development. It seems to be a contradiction, because if what you're withdrawing is the ability to mine, and if they don't have the authority to consent on that question, then what is the consent of that? So, hypothetically, let's say withdrawing an area from mineral entry might result in miners going somewhere else on the National Forest to mine. This isn't the one million acre withdrawal we're talking about. Let's say there's a more limited area that's withdrawn, and it increases the use of service resources elsewhere on the same National Forest. Forest Service might have a legitimate objection based on its management of those service resources. Hey, we're going to see more people coming in and trampling, you know, important plants in another area, rather than mining in this area that's more accessible. Perhaps they'll go try and go to more remote sites that are more environmentally fragile. I mean, what sense is that the people who wrote this objection meant more than that? Because that's fairly remote and hypothetical. I think it's a, you know, it's a measure of good government that it's getting all the different agencies on board that are responsible for managing the lands that they're entrusted to. It's not an opportunity for us. They set this up somewhat differently because they did consent. And the argument is that they couldn't consent because of the forest plan, in which case your answer, I gather, is, well, the forest plan, you know, isn't, can't, either didn't or shouldn't have said anything about mining, which it didn't or it shouldn't have. It shouldn't have. It didn't need to. So, and that's the consistency, the requirement that actions be, that forest service actions be consistent with forest plans only pertains to instruments for the use or occupancy of National Forest Service lands. Mining on National Forest Service lands does not require an instrument to be issued by the Forest Service, a license or a permit or anything. Now, for the initial prospecting, if you will, you can enter the Forest Service lands by operation of law. There's a statute, 16 U.S.C. 482. Why put up a little hut that you need for the permission? So, once you've created a significant surface disturbance, you need to give notice and obtain a plan for operations. But you always said, I mean, if you walk across the property and you carry some instruments and you have a truck, is that good enough? If there's no significant surface disturbance, sometimes you need to give notice to the Forest Service that you're entering. But the Forest Service doesn't need to approve like they would a special use permit. So, that consistency provision just doesn't apply here to the withdrawal. So, I think what it boils down to is a challenge to the content of the consent letter in some regards. And that consent letter was based on the entirety of the EIS, the Environmental Impact Statement, and the record supporting that because the Forest Service was a cooperating agency. So, it had, as a decision maker, all the information before it. And you'll also say that you used a forest plan, but there is some case law saying you can't retroactively do that, isn't there? So, you wouldn't need to reach that question. There's the Southeast Future case dealing with amendments. And there's some language in that about plan revision. If you conclude that the forest planning just simply excludes minerals development, then I don't think you need to reach whether it had to comply with the prior version or the current version of the forest plan. But if we did, then we had to decide that, didn't we? If you did have to decide whether it was, you know, it would be a futile remand if this court were to send the decision back for the Forest Service to determine consistency with its forest plan because it now has a new forest plan. And any new consent would have to be as of the new date after the remand. And the current forest plan, which is not being challenged here, simply reflects the withdrawal. And there's no question that it would be consistent. So, whether it's jurisdictionally moot or for prudential reasons, it just would be a futile remand. I think you get to the same result. Okay. Unless the court has any further questions. Thank you, Your Honors. Ted Zukoski for Grand Canyon Trust and Havasupai Tribe. I repeat that you do not have to use your time. Go ahead. Thank you. Your Honor, earlier discussed the fact or what is the test for what Congress would have done otherwise if this veto would have been set aside. But the test is would Congress, the courts look to, is would Congress have preferred to have eliminated entirely the Secretary's large tract withdrawal authority? Well, I don't know that that's true. This is what I was saying before. It seems to me the question is would the statute have looked different? Well, Your Honor, that's not the test that the courts use. My understanding of the court, of the case law, is that when appellants argued that these. . . That was not what would they have left some provision in. Would they have left this provision in? Yes. Would they have preferred to have no large tract withdrawal authority? No. Would they have left in the provision about large tract withdrawals that's there? Yes. Or would they have had a different one or none? In other words, I don't see why the issue is limited to the question of whether they would have had none as opposed to whether they would have had a different one. Well, Your Honor, again, I think the case law says that the question is would the. . . Would Congress have preferred no large tract withdrawal authority? Your Honor, I want to know why I'm not. . . It isn't logical for. . . I don't think anybody's ever directly interested this way. I mean, when you say would they have left out the provision, you mean would they have left it out this provision? They might have had a different provision, but why do we have to assume that Congress would have had no large tract withdrawals as opposed to a smaller one or a. . . or one with more procedural requirements or one for less time or who knows what? Well, Your Honor, again, that's just my understanding of the case law. Oh, fine. Okay. I'm sorry. You just keep saying that and not answer my question. I'm sorry, but I will. . . Let me move on and address one of the other standards for. . . Well, courts are to look at not only the text and the structure, but the legislative history when considering large tract withdrawals. And the primary indicia of legislative history is congressional reports. And if you look to the congressional reports, you will see that Congress identified. . . Well, first of all, the Senate report says nothing at all about limiting executive withdrawals. So the Senate was not interested in limiting secretarial withdrawals or large tract withdrawals. And so the absence of a legislative veto was not above the Senate at all. The House report talks about the importance of congressional oversight, which is preserved absent the legislative veto. It also discusses the procedural controls that are placed in Section 204C on large tract withdrawals, including the important controls of the time limitation on the withdrawal and on the limits who can undertake withdrawals, if only those who have been confirmed by vice and consent of the Senate. And it discusses the report, which is a critical, critically important to provide not only Congress, but the executive with information absent the. . . Pardon me. . . Critical to providing information to the executive about and to Congress about whether or not to undertake a withdrawal. And if you look at the cases in which legislative vetoes were severed, Chadha, Alaska Airlines, Gulf Oil, and Alabama. . . I just think we've had plenty of argument on this issue. Is there something else you want to argue? Thank you. Yes, Your Honor. With respect to the withdrawal, the withdrawal was amply supported on the grounds that it would protect tribal resources. There is. . . And, again, I think it's a. . . Let's look at first what is the standard for whether withdrawals may be made. And the standard is in FLTMA, withdrawals must maintain public values. That is the standard. So withdrawals must be upheld if there is evidence to show that they are protecting. . . Sorry, that they are maintaining public values. And it is clear that the record has ample evidence to show that permitting mining to continue in the absence of a withdrawal would have potentially irreversible impacts on tribal homelands, traditional use areas, landscapes, and, in addition, many sites that may not be known or may not be disclosed by the tribes. And there is certainly legal support for protecting these kinds of values. What kinds of values does FLTMA recognize? It recognizes scenic values, historic values, ecological and environmental values, water and human uses. All of those are interconnected with the cultural identity of the tribes who use these areas, have used them for millennia, and continue to use them today. So further, I would point this court to the Mount Royal Joint Venture case in the D.C. Circuit in which there was a challenge to a 20,000-acre withdrawal, which was challenged on the grounds, in part, that the landscape, that it would be a violation of the Establishment Clause if the, it was a violation of the Establishment Clause because the landscape was protected, in part, to protect areas that were important to the tribes. The court rejected that, concluding that protection of tribal and cultural resources was a valid purpose under the withdrawal because it was, again, because it was maintaining those public values on the land and those values were valid public values. What does the cultural values purpose apply to the entire tract or only pieces of it? It applies to the entire tract. I thought it would apply principally, I mean, I gather the problematic pieces, the piece outside the watershed or arguably outside the watershed, and then is that the piece that has the most cultural value? What is the piece where the most concern is about the cultural values? My understanding is that there are cultural sites scattered throughout this entire area and that one of the north parcel, which is the parcel where there's some disagreement about the watershed, I'm sorry, can you repeat your question? Well, I was suggesting that my understanding of the north parcel was seen as a, there's evidence in the record that the north parcel is part of an interconnected series of landscapes that are the home territory of the Sutter Paiute tribe, and so the entire area was considered to be important by the Interior Department. The entire area, meaning that all thousand acres, all million acres, or all of this area? All of the north parcel. That's what I asked you. Yes. Excellent. And on this issue of the north parcel, whether or not the area extended beyond the watershed, I would just point out that nobody was surprised that the north parcel was the shape it was, and that all of that area was proposed for withdrawal because it was proposed initially by the governor of Arizona. It was proposed by Indian tribes. It was proposed by Representative Grijalva in his legislation. It had always been within the proposal for withdrawal because of the potential impacts of mining. In addition, while the surface water definitely flows toward the Virgin River, away from the Grand Canyon, there is uncertainty, and we cite the administrative record in our brief, there's uncertainty about where the groundwater flows. Some of it flows north, but some of it flows south toward the Grand Canyon, so that watershed boundary is unclear. Further activities in the remainder of the north parcel. Okay, your time is up. Thank you. Thank you very much. I have two messages for you. Thank you. It is notable that the over 1 million acre withdrawal at issue here is over 200 times the size of the small tract withdrawal authority set by Congress, 5,000 acres or less. That's the authority that the Congress freely delegated to the Interior Secretary. The restrictions of Federal Register notice in a hearing apply to that small tract withdrawal authority, as well as the large tract authority. The main difference for the large tract authority delegation is the congressional veto power. Congress clearly viewed that as a significant authority that it was to retain as part of that delegation. The Section 204A delegation contains that congressional veto power limitation. That provides the strong evidence that would overcome any presumption associated with a general severability clause. The retention of the congressional veto power is contained directly within the subsection 204C1, which is the provision making the delegation. But this will be the first case. Because of your argument, that will then come out and say that you have accepted the clause and you're not going to settle for that. Your Honor, this is a case of first impression under this statute. It is before this court because of the case and controversy of this very large withdrawal that's been made. Well, based upon what you perceive to be Congress's underlying intent, that's the members that's called out as the local representatives. Your Honor, we're not having to guess about Congress's intent. We suggest that it's evident from the plain language of the statute. That's sufficient. The plain language here is particularly strikingly inclining. Why? Because the delegation of the large withdrawal authority has the congressional veto power embedded directly within the same subsection. But certainly there are cases where what has been stricken has been a separate source of words or whatever. I mean, that's not a barrier. But in general, it's not a barrier. It's not strictly a barrier, Your Honor, but this case is quite unique. And I would urge you to please consider the views of Professor Glixman in the Hastings Law Journal article. It's a thorough article in 1984, and it's as timely today as it was when he wrote it after the Chatham decision. But this is the case that has brought the issue before the court that hasn't been decided. Thank you. Thank you, Your Honor. Just one point to the government's argument that relief on the Forest Service issue would be futile. I direct this court to Judge Reinhart's controlling opinion in Sierra Forest Legacy v. Sherman, where he addressed that argument in a similar context about a retroactive amendment to the Forest Plan that was inconsistent. But isn't the difference here that this is only a consent requirement in the end? Your Honor, but that consent affects the rights and obligations of the Forest Service, and it affects the rights and obligations of the use of the Forest Service. And as a result, I ask this court to reverse the decision and disregard it. Thank you. Thank you.
judges: Berzon, Murguia, Block